NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200554-U

NO. 4-20-0554

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 1, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| SCOTT ALLEN, | ) | No. 19CF607 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

_____

JUSTICE BRIDGES delivered the judgment of the court.
Justices Harris and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*: There was sufficient evidence to establish that defendant personally discharged the firearm that killed the victim; the trial court did not abuse its discretion in admitting evidence of defendant's gang affiliation to establish motive; there was no error in the admission of the rap videos as defendant acquiesced to their admission; and trial counsel was not ineffective for failing to object to purported hearsay statements, where the failure to object was a matter of trial strategy. Therefore, we affirm.

¶ 2    Defendant, Scott Allen, was convicted of three counts of mob action (720 ILCS 5/25-1(a)(1) (West 2018)), aggravated discharge of a firearm (*id.* 24-1.2(a)(1) (West 2018)) and three counts of first degree murder (*id.* 9-1(a)(1), (2) (West 2018)) in the shooting death of Juan ("Buck") Nash and was sentenced to 50 years' imprisonment. On appeal defendant challenges the sufficiency of the evidence, arguing that evidence identifying him as the shooter was too unreliable to support a conviction. Defendant also challenges the admission of evidence relating to his gang affiliation. Finally, defendant argues that his trial counsel was ineffective for failing to object to

inadmissible hearsay statements. For the following reasons, we affirm the judgment of the circuit court of McLean County.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Basic Timeline

¶ 5             On April 2, 2019, a block party, known as Vido Day, was held on Orchard Road in Bloomington, Illinois, commemorating the life of David "Vido" Parks. Three videos taken of Vido Day were admitted into evidence. Two were taken by Facebook user Tony Tone, who was later identified as Isiah Franklin, one before dark, and one after dark. The third was taken by an individual identified as Jonte Warner. The videos showed Buck and others drinking and smoking what appeared to be marijuana cigars. In the video posted by Jonte Warner, defendant sends a message reading, "Y'all outside Ofn," and Warner then tells the defendant to "slide," inviting him to drop by. The video taken after dark shows defendant at the Vido Day party wearing a fanny pack.

¶ 6             At some point Nyrisha James, Brooklyn Turner, and Donnae Yates, met up with defendant and his friends, Justin Walls, Amari McNabb, and Exodus Hebert. They all then drove to the Vido Day party on Orchard Road. Defendant, Turner, James, Exodus, and Justin were in James's car. Amari was in Yates's car with Yates and another girl. Defendant and some of his friends left the party to go to Pheasant Lanes Family Fun Bowling Alley at 804 N Hershey Road, in Bloomington.

¶ 7             Surveillance footage from Pheasant Lanes showed defendant, Amari, Exodus, and Justin arriving at the bowling alley in a red sedan around 9:21 p.m. Defendant and Justin were wearing fanny packs slung across their chests.

¶ 8        Turner drove James's car to the bowling alley to pick up defendant and his friends around 9:35 p.m. She drove them back to Orchard Road, and as they got out, they told her not to leave. A few minutes later, Exodus jogged back to the car and told her it was too cold out there for him. After which there was an exchange of gunfire in which defendant, Buck, and Buck's friend Nathaniel (Nate) Caldwell were shot.

¶ 9        After hearing the gunshots, Turner tried to leave. As she did, Exodus grabbed the wheel and said, "Don't leave my brothers." Defendant, Amari, and Justin then returned to the car and told her defendant had been shot. She then drove to the hospital. Security footage from the hospital showed defendant and his friends enter the hospital around 9:54 p.m. It then shows Amari, Exodus, and Justin leaving about 30 seconds later.

¶ 10       Buck, who had been fatally wounded, drove north down Orchard Road in Caldwell's truck, before eventually crashing into a home at 1604 Wildwood Road. Police arrived shortly before 10 p.m. to find Buck slumped over in the driver's seat of the truck. He was later pronounced dead at the hospital.

¶ 11                    B. Witnesses to the Shooting

¶ 12       Evidence established the shooting took place near the end of a driveway located between 1227 and 1229 Orchard Road. Immediately prior to the shooting, Wright's car was parked in that driveway facing towards the street. Caldwell's dark gray Chevy Tahoe truck was parked on the street immediately south of the driveway. There was a dark colored Chevy Impala parked on the street behind Caldwell's truck.

¶ 13       Caldwell testified that he drove to the Vido Day event in his truck. When he arrived, there were approximately 10 people there, including Wright, Buck, and Thomas. He parked on the street near a driveway. He recalled seeing defendant, McNabb, and Exodus arrive at the gathering

- 3 -

in a gray car. When the shooting occurred, he was in the rear driver's side seat of the truck, talking with Thomas who was in the rear passenger seat. They were playing music in the truck with the driver's door open. He then heard shots coming from the direction of the front of the truck and began to run towards the rear of the truck towards the sidewalk. He was shot three times, once through the leg, once through the shoulder, and once in the back. After the gunfire ended, he laid behind the Impala until help arrived. He did not see who fired the shots, and did not know where Buck, defendant, Amari, or Exodus were. He did recall hearing two groups of shots, and that they sounded different. Caldwell admitted to being intoxicated that day.

¶ 14　　　　　Daronte Thomas testified as follows. He did not recall exactly who was at Vido Day as he was drunk and had been smoking marijuana. He said that he could not recall anything about the interview he had with Detective Bierbaum, the lead detective in the instant case. He did recall seeing a muzzle flash in his periphery vision and hearing shots. He then ran away from Orchard. He returned after the gunfire had ceased and found Caldwell had been shot. He stayed with him until an ambulance came.

¶ 15　　　　　Due to inability to recall some of the events from that date, edited portions from a recorded interview Thomas gave with Bierbaum were played for the jury. In that interview, Thomas describes seeing between three and four younger individuals. He described their features and clothing, and it generally matched the features and clothing of defendant and his friends. He recalled that when the group first arrived it was just about to get dark. The group then returned after it was dark. The group walked past him to speak with Buck, who was near the sidewalk, and they were standing around five feet away from Buck. Thomas was talking with other people when he heard shots. From his peripheral vision, he saw muzzle flashes coming from the general area of

the group towards Buck. He then ran away. He recalled that there was a set of shots, a pause, then another set of shots.

¶ 16        Michael Holton testified that on April 2, 2019, he was on Orchard Road to celebrate the "death day" of Vido, a friend. Holton was there with Buck and several friends. Holton was Buck's brother-in-law. He testified that he got to Orchard Road around 6 p.m. At the time of the shooting there were around 15 people at the party. As the evening went on, Holton was leaning against the hood of Caldwell's truck. Defendant arrived at the party with Amari. Defendant was wearing a fanny pack. Amari and Buck were talking on the sidewalk in front of the Tahoe, about five feet from Holton. Holton talked to defendant for five or ten minutes before defendant went to join the conversation Buck was having. Defendant and Amari walked off away from the group, and Holton talked to Buck who was standing on the driveway near the sidewalk. About five or ten minutes later, Amari and defendant came back. Buck said to them, "Keep my little brother out of this; he ain't got nothing to do with it." Holton then saw a muzzle flash from his right, and saw defendant fire a gun at Buck. He then ducked and ran away.

¶ 17        The following detailed colloquy was presented between the prosecutor and Holton regarding the shooting:

> "Q. All right. Let's start—let's start first with, you said you saw them turn around. Who is them?
>
> A. Scotty and Big A.
>
> Q. And you said they walked back up, what do you mean by that?
>
> A. Walked back up the path, shot at them.

Q. Well, where were they—where were they—so let's take this piece by piece, I guess. So when you say they turned around, were they turning around to go away from Buck or towards Buck?

A. They turned around and—they turned around and walked off.

Q. They—

A. Yes.

Q. They walked off first you said?

A. Yes.

Q. So then what did you see after they turned around and started to walk off?

A. I turned back around, started talking to Buck. And five, ten minutes later they came back.

Q. Who came back?

A. Scotty and Big A.

Q. What did you see when they came back?

A. I saw a flash, saw the gun flash, heard one shot.

Q. Where was that—where did that gun flash come from?

A. From the right side.

Q. Did you see who was holding the gun?

A. Yes.

Q. Who was that?

A. Scotty.

Q. What happened after you saw the muzzle flash from the gun Scotty was holding?

A. I ducked.

Q. You ducked?

A. Yes.

Q. What happened next?

A. Ducked and ran.

Q. Did you see anything else during that shooting?

A. No.

* * *

Q. Before you saw a flash and heard the shot, did you hear Buck say anything to those two people, to the defendant and the other guy?

A. Yes.

Q. What did he say?

A. He said, [']Keep my little brother out of this; he ain't got nothing to do with it.[']

Q. And that's Kajuan?

A. Yes.

Q. From what—from where you were and what you saw, who shot Buck?

A. Scotty."

¶ 18    Holton was cross-examined regarding his account of the shooting he had provided in his previous interviews with Bierbaum and Swanlund. During that interview, Holton initially denied knowing if there was a "beef" between defendant and Buck. He later admitted there was a

beef between the two that involved Buck's brother, Kajuan. Holton was not sure if the beef was due to "killing one of his homies."

¶ 19 The following colloquy was presented by defense counsel regarding statements Holton made to Detectives Bierbaum and Swanlund:

"BIERBAUM: [W]hen did you see Scotty up the gun?

A. It happened so fast; when they turned back around, they walked and turned back around; I seen the flash.

* * *

Q. How sure are you that Scotty is the one who upped the gun?

A. Because it was something funny with it; because I was in the street and I told you the black guy was talking to my friend Scotty and Scotty walked over there.

Q. So how confident are you that Scotty is the one who upped the gun?

A. Man, I know him for having guns on him.

Q. Okay.

A. I know his demeanor sometimes.

* * *

Q. How do you know for sure that he upped the gun?

A. I know him to carry a gun.

Q. Michael, there's a big difference; but there's a big difference, Michael, between you knowing Scotty to carry guns and in that situation you know him to act that way; or that Michael Holton saw Scotty up a gun which is what you told me you saw.

- 8 -

A. I—I—I—I could—I could—I can really—I can really know that demeanor and I know his demeanor, but the black I've never seen; I don't even know that man's name.

Q. Okay, but like you told me earlier, Michael, you told me that you saw Scotty actually up the gun.

A. I know that—I know what it was because it's no purpose for me, you know what I'm saying.

Q. I'm not trying to call you a liar, say you were mistaken; I'm just making sure that I'm hearing and that Detective Swanlund is hearing what you're telling us; is that what you're telling us?

A. Yeah.

SWANLUND: So just so I understand what I'm hearing you say—what I hear you say is that Buck and the black guy are talking about something; Scotty is just kind of standing there; he's in the conversation but he's not saying anything; and what you hear Buck say is whatever you got going on with my little brother leave him out of it; and then Scotty and the black guy turn to walk away, or at least that's what it looked like to you.

A. [Nod]

Q. You thought they were walking away, but then Scotty and the black guy both turned around or just Scotty turned back around?

A. But if I'm not mistaken, I ain't going to lie to you; I was—I was drinking."

Holton maintained that his answers to the detective's questions had been affirmative. He maintained that Buck and defendant had been a foot away when Buck was shot. He admits that on the evening of the shooting he had been drinking and smoking marijuana.

¶ 20    Shawndell "Delly" Wright testified he knew defendant because he was his brother, Little Steve's, best friend. Wright said his best friends were Vido and Buck. He attended Vido Day. While there, he saw defendant, Amari, Exodus, and a "light-skinned dude" that he did not know, arrive at the party. Initially he and Buck were standing outside. At some point the four left. Wright then called Amari, who told him to "move around." Amari's phone records indicate that this call took place at 9:32 p.m. Wright did not take this to mean anything initially, but later he understood it as a warning to get out of the area. He continued to party, but eventually went to his car with Buck as it was getting cold. Wright's car was parked in the driveway where the shots were fired, facing out towards the street. Wright was "rolling some weed" and they were talking. Buck was talking about issues Kajuan Hopson (the deceased's younger brother) had been having with the four. The group then returned, and Buck got out of the car, saying that he was going to "go holler" at them. Buck then stood in front of the car, with defendant and his friends huddled in a circle.

¶ 21    About 10 to 15 minutes later, Wright was looking down at his phone when the first shots were fired. He heard two shots, then looked up and saw Buck fall to the ground and begin shooting. The first shots sounded different than the shots Buck fired. He did not see anyone else in the area besides Buck. After the shooting stopped, Buck got up and got into Caldwell's truck and drove off.

¶ 22       The State sought to impeach Wright with his earlier statements he had made during a recorded telephone conversation with a Joshua Rials, a jail inmate, where he discussed the shooting.

¶ 23       On April 3, 2019, Wright received a call from Joshua Rials, who was in jail at the time. In that call Wright identified defendant as Buck's killer. Portions of the call were read and later played in response to his testimony that he did not see anyone fire except Buck. The call was as follows:

"RIALS: The little—so these are the little op[1] shorties did this shit, Bro?

WRIGHT: Bro, Little 30[2].

* * *

RIALS: I'm like how—how he do that at a function, at our function; just like he saying fuck Vido, you feel me; you saying fuck Vido.

WRIGHT: Bro, we was all kicking it, Bro; I swear to God, Bro; they was—they had a little—they had a little disagreement about, uh—uh, about Kajuan and shit, but Buck went, Hell no, nigger, motherfucker ain't never; I fin to talk to they asses; he was just in the car with me, Bro; I swear to God he just got out of the car with me to talk to them, Bro; last time I looked to him the last words he said, Bro, I'm going to go holler at 30 and them, Bro; they got me fucked up about my little brother, Bro; I ain't trying to let shit happen to my little brother.

RIALS: Period.

* * *

---

[1] McQueen stated that "op" essentially means "opposition gang member."
[2] At least two witnesses testified that defendant went by the nickname "30."

- 11 -

WRIGHT: Yeah, on my kid; he get out of the car; he sitting right there talking to 30 and them. *** I done—I done lift my head down, Bro; I'm just like [inaudible] I see Bro drop; he got to shooting back, though; Buck got to shooting back; he shot like 13 times, boy; he got up, he jumped up, and he got in the car; he like, damn, I'm hit, someone take me to the hospital; as he was saying that, he was running towards Nate car; he was running toward Nate car so he have it; he hopped in Nate car; he hopped in a—Bro, Nate['s] car and drove off; he hit the block and crashed into the building and crashed."

¶ 24    In an effort to establish that Wright was coerced into identifying defendant as the shooter, defense counsel extensively cross-examined him regarding an interview he gave with Bierbaum. We note that Wright's statements to Bierbaum in that interview largely mirrored his trial testimony. During the interview, he initially did not speak with Bierbaum for one and a half hours. After Bierbaum stated that he would be telling the prosecutor whether or not he cooperated, Wright began speaking with Bierbaum. Bierbaum asked if he had received a phone call from Amari prior to the shooting, to which he said yes. However, Amari's phone records showed that he was the one who called Amari. Defense counsel questioned Wright on this point resulting in the following colloquy:

"Q. And in response you say, He called me and told me to move around, correct?

A. Yes.

Q. But he didn't call you; you called him—

A. I called, yes.

Q. —correct? Did you just make this up because Detective Bierbaum was threatening you and prompting you, basically, to say exactly that?

A: Yes.

* * *

Q. So is it your testimony that you only say that you were told to move around because of the way that interview played out and the threats that were made against you?

A. Yes."

¶ 25                                    C. Physical Evidence

¶ 26        Several items of evidence were recovered from the crime scene. Fourteen Winchester 9-millimeter casings were recovered. The 9-millimeter casings were found towards the end of the driveway that runs between the apartment buildings at 1227 and 1229 Orchard Road,[3] where it meets the street, with some of the casings in the street and the others in the driveway.

¶ 27        Two Winchester .25-caliber casings were also recovered. One was found on the northern end of the lower portion of the driveway right before it meets the sidewalk. The other was located at the southern end of the driveway next to the curb.

¶ 28        Four PMC .380-caliber casings were likewise recovered from the yard on the south side of the driveway. Three were found in the area between the sidewalk and the apartment building at 1227 Orchard Road, and one was found in the area between the sidewalk and the curb.

¶ 29        Four bullet fragments were recovered. A .38-caliber fragment was recovered from the street underneath a black Chevy Tahoe that was parked just north of the driveway. Another

---

[3]Orchard Road runs north-south.

.38-caliber fragment was located in the grass a few feet away from the front of the apartment building at 1229 Orchard Road. The other two fragments were found on Orchard Road roughly in line with the driveway. One fragment whose caliber was undetermined was located within a few feet of the curb and the other was a .25-caliber fragment located more towards the center of the road. A Ruger Model 9e 9-millimeter handgun was recovered from the floor of the front passenger seat of Caldwell's truck.

¶ 30       Defendant and Caldwell were treated for their injuries at St. Joseph's hospital. A 9-millimeter bullet was recovered from defendant's body. A 9-millimeter bullet was also recovered from Caldwell's body.

¶ 31       An autopsy was performed on Buck by Dr. John Scott Denton. Buck had been shot four times. He had been shot through the heart by a .25-caliber bullet which was found lodged in his spine. He was shot in the lower left arm by a .38-caliber bullet which fractured his radius and ulna. The bullet fragmented on impact, and the fragments were removed from his left arm. There was a through-and-through wound to his lower right arm, and there was a glancing wound to his right index finger. An unfired Winchester 9-millimeter cartridge was also located in Buck's pocket.

¶ 32       Buck died as the result of the .25-caliber shot which pierced his heart. Denton testified that he did not find any evidence of soot or gunpowder stippling on Buck or his clothing, which would indicate that he was not shot at close range. It was Denton's opinion that Buck could not have been shot from less than 18 to 24 inches away.

¶ 33       The handgun, bullets, fragments, and casings were sent to the Illinois State Police Forensic Laboratory in Morton, Illinois, for analysis and testing. It was determined that the Ruger Model 9e 9-millimeter handgun had fired the 14 9-millimeter casings, as well as the bullets recovered from defendant and Caldwell.

¶ 34        The .25-caliber bullet fragment recovered from Orchard Road was found to have been fired by the same gun which fired the .25-caliber bullet which was recovered from Buck's spine. The two .25-caliber casings recovered from Orchard Road were determined to have been fired by the same gun. The .38-caliber bullets recovered from Orchard Road and those recovered from Buck's left arm were fired by the same gun. The four .380-caliber casings recovered from Orchard Road were determined to have been fired by the same gun. As no .25-caliber firearm was recovered, it could not be determined with certainty whether the .25-caliber bullets were fired by the same firearm that ejected the .25-caliber casings. Likewise, it could not be determined with certainty whether the .380-caliber casings had been ejected by the same gun that fired the .38-caliber bullets.

¶ 35        Detective David Ashbeck testified that after the shooting he went to the hospital where defendant and Caldwell were being treated to collect evidence. At the time, he collected a sample from defendant's hands to test for gunshot residue. Defendant was lying shirtless in a hospital bed. Defendant took his hand out from underneath the blanket as Ashbeck collected the samples. The result of the test was negative for gunshot residue. Shan Mei Jones was the forensic scientist who analyzed the test. As a result of her analysis, she concluded that defendant may not have discharged a firearm, and if he did, the particles were either not deposited, removed, or not detected by the test. She testified that activities such as removing a shirt, rubbing one's hands against something, or washing could potentially remove deposited gunshot residue particles.

¶ 36        Blood stains were discovered behind the dark-colored Chevy Impala that Caldwell had parked his truck in front of. A small bloodstain was found in the grass across the street from the Impala. A black White Sox hat was located near the end of the driveway. Buck can be seen wearing a similar hat in the Facebook live videos. A black and gray New York Yankees hat was

found in the grass near the curb in front of the parked Impala. In the bowling alley footage, Amari can be seen wearing a similar hat. In the surveillance footage from the hospital, Amari is no longer wearing a hat.

¶ 37    Defendant's Facebook records show that on March 28, 2019, defendant was discussing obtaining guns and/or ammunition for a Facebook user with the name "Al Al Pacino." On April 2, 2019, at 7:58 p.m., Al Al Pacino sent defendant three images of a Beretta 950 Jetfire handgun taken from Wikipedia. That handgun fires a .25-caliber cartridge. Records taken from Amari's cellphone show that around 3:20 a.m. on April 2, 2019, Amari searched Google for images of a GT .380 pistol.

¶ 38                              D. Gang Evidence

¶ 39    Prior to trial, the State filed a motion *in limine* seeking to admit evidence of defendant's gang associations. Defendant objected on the basis that the State failed to sufficiently establish that defendant's gang affiliations were related to the charged crimes, and argued that should the evidence be deemed admissible, it should be limited as much as possible so as not to prejudice the defendant. After hearing argument, the trial court determined that most of the State's proposed evidence was admissible. It determined that evidence that there were 45 incidents of street level violence committed by the gang identified as FBMG 200 would not be admitted, nor would a Facebook video posted by the defendant 10 months prior to the shooting. Included in the exhibits to be admitted were two rap videos and a Facebook Live video recorded by defendant on March 21, 2019. The trial court made it clear that although it was admitting the video evidence, it would be amenable to hearing further objections regarding any redactions that should be made to the videos. Prior to trial, the prosecutor and defense counsel came to an agreement regarding redactions to those videos.

¶ 40      Bloomington Police Officer Jack McQueen was accepted as an expert in gang crime analysis and testified as follows: There were broadly two types of gangs, traditional and hybrid gangs. Traditional gangs are highly organized, have a hierarchy, exist inside and outside of prison, have a common creed, code, tattoos, ideology, and rules, and are connected from city to city. Traditional gangs included the Vice Lords or Vice Lord Nation, Latin Kings, Gangster Disciples, Black Disciples, Mickey Cobras, and Black P. Stones. Hybrid gangs are similar, except they do not exist in other cities or in prisons. They are more loosely organized and share some of the same symbols, tattoos, and hand signs that a traditional gang would have. McQueen testified that the definition of a street gang he utilized came from the Illinois Streetgang Terrorism Omnibus Prevention Act (Streetgang Act) (740 ILCS 147/10 (West 2018)).

¶ 41      McQueen was shown a photograph of Buck, and he indicated that the stylized letters "B" and "D" tattooed on his shoulders would indicate that he was a member of the Black Disciples.

¶ 42      McQueen testified that FBMG 200, sometimes just called 200 (200 Gang), and MMG were local hybrid gangs. FBMG stands for Free Bands Money Gang and MMG for Making Money Gang. MMG was associated with and almost indistinguishable from a gang only known as BBE, which was a very similar organization that McQueen described as "like a kissing cousin." He testified that MMG and 200 Gang were rivals, and that between April 2015 and April 2019 there had been 23 violent incidents occurring between 200 Gang and MMG in the Bloomington-Normal area.

¶ 43      Two Facebook photos of Amari were admitted into evidence. McQueen testified that in one of the photographs, Amari was displaying a Gangster Disciple hand sign in a disrespectful manner. In the other photo, he was displaying a hand sign used by 200 Gang members

and wearing a tribute shirt which had been distributed among 200 Gang members following the death of Little Steve, which occurred on Orchard Road the summer prior to Buck's death. McQueen also testified that he had watched a rap video entitled "Cappin for LS," in which he observed Amari making a 200 Gang hand sign.

¶ 44　　　Three photographs of Exodus were admitted into evidence. Based on his examination, McQueen determined that Exodus associated with 200 Gang and the Four Corner Hustler Vice Lords. One of the photographs was taken from Exodus's Facebook feed which displayed him holding a 200 gang sign, and had the captions "#200," "Gang Baby," and "Gang aint nun of dat squad." McQueen testified that Squad was another local rival hybrid gang. Another showed Exodus and another 200 Gang member displaying a Gangster Disciple's gang sign in a disrespectful manner. A screenshot of Exodus's Facebook profile cover showed a photograph of Exodus displaying a Gangster Disciple sign in a disrespectful manner while wearing his hat to the left, which McQueen testified meant that he affiliated with the People Nation, which the Vice Lord gangs fall under. The cover page had the caption "4 Corner Hustla Solid" and "I'm 200 4L OMB." McQueen testified that the Gangster Disciples were traditional rivals of the Four Corner Hustlers. McQueen testified that he had viewed a rap video on YouTube entitled Misfit, which featured an image of Exodus displaying a 200 Gang sign.

¶ 45　　　Five photographs from an individual named Trevonte Kirkwood's social media account were admitted into evidence. McQueen testified that he classified Kirkwood as belonging to 200 Gang. One photograph showed Kirkwood standing with a group of people displaying a 200 Gang sign, and another person in the photograph was displaying a People Nation sign. Two photographs showed Kirkwood alone displaying 200 Gang signs. Another showed Kirkwood displaying a Gangster Disciple sign disrespectfully. An image taken from Kirkwood's social media

showed a star with the initials of different Vice Lords groups around it with the caption "We Are Family." Kirkwood was murdered in October 2018 on North Oak Street in Bloomington.

¶ 46 McQueen testified that defendant was associated with 200 Gang and the Four Corner Hustler Vice Lords. Four screen captures from defendant's social media were admitted into evidence. One showed defendant holding a Gangster Disciple sign in a disrespectful manner. A Facebook post was admitted in which defendant asks to be questioned regarding his knowledge of the Four Corner Hustler Vice Lords. In a later post, he states defendant recited a portion of the gang's rules every day in the mirror. In another post, defendant states, "Want a Real solid nigga that's gone beat it up. Fuck you up & get to the money Get you a 4CH." In a post dated April 3, 2019, the day after the shooting, defendant proclaims, "I'm around bread winners & shooterz we'll put a price on ya head or leave ya dead ourselves."

¶ 47 A record of a Facebook conversation between defendant and Marcel Mayoyo, who identified himself as defendant's cousin, which took place on April 30, 2019, was admitted into evidence. In that conversation, Mayoyo tells defendant that he is on the bus heading to downtown Bloomington and that he is being followed by a rival gang member, Kajuan, who had robbed him. Mayoyo indicates that he believes Kajuan has a gun. He describes how Kajuan had confronted him regarding 200 Gang and the defendant. He goes on to describe how he saw Kajuan give another man a signal, and that he got away from them near the courthouse. Defendant says, "On god fuck them" and "We on they ass." Defendant then warns Mayoyo to keep his head up, that they are "thirsty for anybody," and believes Mayoyo is with 200 Gang. Defendant states that Mayoyo practically is a member of 200 Gang because he is family. Mayoyo then states that he knows that Kirkwood was killed because of his affiliation with 200 Gang. Mayoyo then expresses that he needs to get a gun for his home. Defendant states he will get some for the two of them.

¶ 48 The Misfit video (People's Exhibit No. 13) was played for the jury. McQueen testified that defendant was the one singing in the video. The video displayed a still image of Exodus and defendant standing together. Exodus is displaying 200 Gang signs, and defendant is flipping off the camera. The lyrics of the song referred to "throw up twos holding 33s when we get to blowin' " and "a couple of the homies dead, yeah I miss them closely." McQueen testified that "throwing up twos" referred to flashing a 200's gang sign, and that "holding 33s when we get to blowin' " refers to doing a drive-by or shooting rival gang members with either a Glock 33 model or extended-magazine handgun.

¶ 49 The rap video entitled "Cappin for LS" (People's Exhibit No. 15), was played for the jury. The video begins with a photo of Little Steve with the words "Long Live Lil Steve" underneath. The video shows defendant holding a handgun near his face and donning a ski mask. It also features Amari holding two bags of what appears to be marijuana. Later in the video defendant can be seen wearing an Adidas fanny pack slung across his chest and pointing a handgun at the camera. McQueen explained that from January 2019 through April 2019, police in Bloomington, Normal, Champaign, Springfield, and Decatur had seen an increase in the use of fanny packs to carry handguns. McQueen also testified that the lyric "fuck 12" meant "fuck the police."

¶ 50 Kajuan Hopson testified as follows. Defendant, Amari, Exodus, and "Main" were associated with the 200 Gang. In a prior interview with police, he identified Main as Javares Hudson. He testified at trial that he was not in a gang, but was friends with members of the BBE, and that BBE was similar or the same as the MMG. He also testified that Buck was not in a gang. However, he acknowledged that he had previously told Bierbaum that he and Buck were both Black Disciples. Likewise, he testified that he did not know Caldwell's gang association but had

previously told Bierbaum he was a Black Disciple. He did not know what gang Vido had associated with. He testified that 200 Gang and MMG do not get along. However, he had told police that it had been a while since the 200 Gang and MMG had a problem. He testified that Little Steve had been a member of the 200 Gang.

¶ 51　　　　He did not think Little Steve's death was related to Buck's death. He did believe that Buck's death might be related to Kirkwood's death. He believed that the 200 Gang blamed him for Kirkwood's death and because they could not get to him, they killed his brother Buck. He had not fought, argued with, or received threats from defendant, Amari, or Exodus. He had previously told police that he believed his brother's death may have been a setup by Malcolm Johnson[4] and Wright. He testified that he had not received any threats from 200 Gang. However, he had previously told police that he had received threats from defendant's cousin Main, that he would kill him, or that when he caught him, he would stand over him and kill him.

¶ 52　　　　Defendant was found guilty of three counts of first degree murder, aggravated discharge of a firearm, and mob action. The jury also found that defendant personally discharged a firearm that proximately caused the death of another person. Defendant was sentenced to 50 years' imprisonment.

¶ 53　　　　This appeal followed.

¶ 54　　　　　　　　　　　　　　II. ANALYSIS

¶ 55　　　　Defendant raises three issues on appeal. First, he challenges the sufficiency of the evidence, arguing primarily that the testimony of Holton and Wright was too unreliable to establish defendant's guilt beyond a reasonable doubt. He also argues that the trial court erred in admitting evidence of defendant's gang affiliation as it was unduly prejudicial. Finally, he argues that he

---

[4]No testimony was ever introduced as to who Malcolm Johnson was, but in opening statements defendant indicated that Malcolm Johnson was the one who drove defendant and his friends to the bowling alley.

- 21 -

received ineffective assistance of counsel when trial counsel failed to object to the admission of hearsay statements regarding Buck's statements prior to his death.

¶ 56                              A. Sufficiency of the Evidence

¶ 57          When considering the sufficiency of the evidence, a reviewing court, viewing the evidence in the light most favorable to the State, must consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). A reviewing court will not substitute its judgment for that of the trier of fact on the credibility of witnesses or the weight of the evidence. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000). The same standard applies whether the evidence is direct or circumstantial (*People v. Thomas*, 178 Ill. 2d 215, 232 (1997)), and whether there is a bench or jury trial (*People v. Howery*, 178 Ill. 2d 1, 38 (1997)). Therefore, a conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that it justified a reasonable doubt of the defendant's guilt. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007).

¶ 58          Defendant was found guilty of aggravated discharge of a firearm, mob action, and three counts of first degree murder. For aggravated discharge of a firearm, the State had to demonstrate that defendant knowingly discharged a firearm in the direction of a person. 720 ILCS 5/24-1.2(a)(2) (West 2018). For mob action, the State had to demonstrate that defendant acted together with one or more persons without authority of the law to knowingly disturb the public peace by use of force or violence. *Id.* § 25-1(a)(1). For first degree murder, the State had to prove that defendant caused the death of Buck, and that when he did so, he intended to kill or cause Buck great bodily harm, that he knew that such acts would cause Buck's death, or that his acts created a strong probability of death or great bodily harm to Buck. *Id.* § 9-1(a)(1), (2).

¶ 59        Defendant argues that the State's theory of the case was that defendant killed Buck because he blamed Kajuan for the death of Kirkwood, but the State failed to present any evidence that Kajuan murdered Kirkwood or that defendant harbored animosity towards Kajuan. Nevertheless, the State did present evidence that defendant blamed Kajuan for Kirkwood's death. Kajuan testified that he believed that Buck was killed because 200 Gang blamed him for Kirkwood. Additionally, the conversation between defendant and Mayoyo showed that they blamed Kajuan and his associates for Kirkwood's death and that defendant did harbor animosity towards them. "[M]otive is not an essential element of the crime of murder, and the State has no obligation to prove motive in order to sustain a conviction of murder." *People v. Smith*, 141 Ill. 2d 40, 56 (1990). Further, in order to establish motive, it was not necessary to establish that Kajuan was actually responsible for Kirkwood's death.

¶ 60        Defendant also argues that the lack of gunshot residue demonstrates that he did not fire a weapon. However, in light of the fact that defendant had removed his hooded sweatshirt and T-shirt, had moved his hands in and out of the hospital blanket, and had possibly been cleaned by the hospital staff, it would not have been unreasonable for the jury to conclude that any gunshot residue had been removed by the point the sample was taken.

¶ 61        Defendant raises several issues with Holton's testimony including, *inter alia*, that (1) Holton's timeline of events is inconsistent with that of other witnesses and the footage from the bowling alley; (2) as Buck's brother-in-law, he was biased; (3) Holton did not describe the gun or say that it was drawn from a fanny pack; (4) his testimony was equivocal and uncertain as whether he had seen defendant with a gun; and (5) his testimony that defendant was a foot away from Buck when he shot was contradicted by the physical evidence. Defendant similarly argues that Wright's interview with Bierbaum and subsequent trial testimony were coerced and unreliable.

¶ 62    We disagree with defendant that there was insufficient evidence to prove him guilty beyond a reasonable doubt. Undoubtedly, there were flaws in Holton and other eyewitnesses' testimony. Most of the attendants of the Vido Day festivities had gang affiliations and had been drinking and smoking marijuana. However, it is for the trier of fact to determine how flaws in part of the testimony affect the credibility of the testimony as a whole. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). As such, even deliberate falsehoods or contradictory testimony will not automatically destroy the credibility of a witness. *Id.*; *People v. Gray*, 2017 IL 120958, ¶ 47. "Where the record is not such that the only inference reasonably drawn from flaws in the testimony is disbelief of the whole, a reviewing court should bear in mind that the fact finder had the benefit of watching the witness' demeanor." *Cunningham*, 212 Ill. 2d at 284.

¶ 63    Holton not only mentioned that defendant's demeanor indicated he was carrying a gun and that he knew defendant to carry a gun, but also he positively indicated both in his initial statement to the police and in his trial testimony that he saw defendant holding a gun and firing that gun at Buck. His testimony was corroborated in several respects as well. While Wright testified at trial that he did not see defendant fire the gun at Buck, he did identify defendant as the shooter in the jail call with Rials. Likewise, he testified that Buck was concerned about what defendant and his friends might do to Kajuan. And although defendant challenges Wright's credibility on the basis that his statements were coerced by Bierbaum, we have the recording from the phone call with Rials made the day after the shooting, which matches almost every aspect of his trial testimony.

¶ 64    The fact that there are discrepancies in the eyewitness accounts regarding matters such as exactly where and how far away everyone was standing, or how defendant and his friends were gone before they returned from the bowling alley, does not render the whole of Holton's

testimony so unreliable that the jury could not rely on it in reaching its verdict. See *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 53 (minor discrepancies in witness testimony do not automatically render the testimony incredible); *Gray*, 2017 IL 120958, ¶ 40 (the fact that a witness had been drinking does not preclude the trier of fact from finding them to be credible).

¶ 65    Holton's testimony alone was sufficient to prove defendant guilty of aggravated discharge, in that Holton testified that defendant fired a gun at Buck. *People v. Stringer*, 52 Ill. 2d 564, 569 (1972) (holding that the testimony of a single identifying witness is sufficient to convict, so long as the witness is credible and had the opportunity to view the defendant under circumstances which would permit a positive identification to be made). The ballistic evidence which showed that Buck had been shot by two different guns, coupled with the presence of defendant's friends and fellow gang members is sufficient to establish mob action.

¶ 66    With regard to the first degree murder convictions, defendant was found guilty as the principal offender, in that he fired the shot that killed Buck. We know from the ballistic evidence that Buck was shot by both a .25-caliber round and a .380-caliber round. We also know that the .25-caliber round was the fatal shot, as it pierced Buck's heart. While the only gun recovered in the instant case was Buck's, there is circumstantial evidence from which the jury could have found that defendant was the one who fired the .25-caliber gun versus the .380-caliber gun. *People v. Hall*, 194 Ill. 2d 305, 330 (2000) ("Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged.").

¶ 67    On March 28, 2019, defendant was discussing obtaining guns and/or ammo for someone with a Facebook username of "Al Al Pacino." On April 2, 2019, at 7:58 p.m. Al Al Pacino sent defendant three images of a Beretta 950 Jetfire handgun taken from Wikipedia. That handgun

fires a .25-caliber cartridge. Meanwhile, around 3:20 a.m. on April 2, 2019, Amari searched Google for images of a GT .380-caliber pistol. The .380-caliber casings were located in the grassy area on the passenger side from Caldwell's truck, where Amari's hat was found. We know that both defendant and Caldwell were shot by the 9-millimeter handgun wielded by Buck.

¶ 68    Moreover, prior to the shooting, Caldwell was in the back driver side seat of his truck. Once the shooting started, he got out and ran towards the back of his truck, was shot, and ultimately ducked down behind the Impala. There were blood stains behind the Impala. There was also blood found in the grass on the other side of the street across from the Impala. The fact that Caldwell and the defendant were both shot, and blood was found across the street from where Caldwell went to lie down places the defendant on the driver side of the parked vehicles, away from the .380-caliber casings.

¶ 69    Additionally, Holton testified that defendant fired first, causing Buck to fall to the ground. Wright corroborates Holton's testimony that Buck fell to the ground. A jury could reasonably conclude that a wound to the chest would be more likely to cause a person to fall to the ground than a wound to the arm. This is also consistent with the fact that Buck concentrated his fire on defendant, and not the other shooter. Here, two eyewitnesses identified defendant as the shooter, and no opposing witness testified otherwise.

¶ 70    Taken together, a jury could reasonably conclude beyond a reasonable doubt that the defendant was the shooter that fired the .25-caliber round which ultimately led to Buck's death.

¶ 71    B. Gang Evidence

¶ 72    Defendant next argues that the trial court erred in admitting excessive, irrelevant, and prejudicial gang evidence.

¶ 73    While jurors may have a strong prejudice against street gangs, evidence of gang affiliation need not be excluded if it is otherwise relevant and admissible. *People v. Smith*, 141 Ill. 2d 40, 58 (1990). "Such evidence may be admitted so long as it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect." *People v. Johnson*, 208 Ill. 2d 53, 102 (2003). Evidence of a defendant's gang affiliation is generally admissible to show common purpose or design, or to provide motive for an otherwise inexplicable act. *Smith*, 141 Ill. 2d at 58. "Such evidence, however, is only admissible where there is sufficient proof that such membership or activity is related to the crime charged." *Id.* Evidence of gang affiliation is relevant if it tends to make the existence of a consequential fact more or less probable than it would be without the evidence. *People v. Villarreal*, 198 Ill. 2d 209, 232 (2001). The trial court's rulings regarding the admission of gang evidence are reviewed for an abuse of discretion. *Johnson*, 208 Ill. 2d at 102.

¶ 74    The State argues generally that defendant has forfeited review of the issues raised in his brief regarding the admissibility of gang evidence, as he failed to raise these arguments before the trial court. We disagree. Defendant argued before the trial court that there was insufficient evidence to show that defendant's activities were related to the charged crimes and that portions of the evidence were unduly prejudicial. While defendant had expanded the scope of these arguments on appeal, he is not limited to only the arguments raised at trial, so long as he preserved the issue for appeal. *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 18. As such, we do not find that defendant forfeited all arguments on this point.

¶ 75    Defendant argues as follows. There was no evidence of conflict between 200 Gang and the gangs with which Buck and Kajuan associated. Buck and Kajuan were Black Disciples, and no evidence was presented that there was any rivalry or tension between the Black Disciples

and the 200 Gang, and in fact McQueen testified that they shared a common disrespect for the Gangster Disciples. Kajuan had also testified that he associated with members of MMG and BBE, but he told Bierbaum it had been a long time since 200 Gang and MMG had problems.

¶ 76        Defendant's argument that there was no evidence of tension between Kajuan and 200 Gang is likewise unavailing. Kajuan testified that members of 200 Gang blamed him for Kirkwood's death, and he believed they killed Buck because they could not get to him.

¶ 77        Additionally, the Facebook conversation between defendant and Mayoyo on April 30, 2019, demonstrates the tensions between 200 Gang, Kajuan, and his associates. While at no point in the conversation do they make it clear which of the gangs Kajuan associated with were targeting 200 Gang members, it is clear that Kajuan was involved in a gang dispute with 200 Gang.

¶ 78        This coupled with Buck's statements regarding his concerns about defendant and his brother make it clear that Kajuan's dispute with the 200 Gang was the motivating factor behind the violence between defendant and Buck. As such, evidence of defendant's gang affiliation was relevant to the charged crimes.

¶ 79        Defendant also argues that the State's gang expert, McQueen, testified extensively on a number of topics which were irrelevant to the instant case. Particularly defendant argues that McQueen's testimony regarding gang tattoos, clothing, colors, hand signals, slogans, and graffiti were irrelevant, as there was no evidence that defendant utilized any of these on the night Buck was killed. Defendant also argues that through McQueen's testimony, the State elicited the statutory definition of a street gang, which constitutes an improper jury instruction and amounted to an expert testifying about a matter of statutory interpretation.

¶ 80        We disagree with defendant's assertion that McQueen's testimony regarding the general practices of street gangs and their ephemera was excessive or irrelevant. McQueen testified

generally regarding how gangs are organized and the symbology members use to communicate their association. This information provided a general background for the specific evidence of gang affiliation, on which he would go on to opine. As to McQueen's testimony regarding how he defined a street gang, this aspect of McQueen's testimony was not raised during the State's motion *in limine*, and as such defendant's failure to make a contemporaneous objection or raise this particular issue in his posttrial motion constitutes forfeiture of the issue. *People v. Johnson*, 238 Ill. 2d 478, 484 (2010). Further, as the Streetgang Act was not at issue in the instant case, even if McQueen's testimony was erroneous, defendant has failed to show how he was prejudiced.

¶ 81    Defendant also takes issue with McQueen's testimony that 23 acts of violence were recorded between the 200 Gang and MMG between 2015 and 2019. Defendant argues that only two or more acts of gang related activity are required to show that an organization is a street gang under Section 10 of the Streetgang Act. Defendant also argues that the evidence constitutes improper other crimes evidence.

¶ 82    We do not find defendant's argument on this point convincing. Section 10 of the Streetgang Act is inapplicable as the violent incidents were not being introduced for the purpose of establishing 200 Gang or MMG as street gangs, but rather for the purposes of showing that the two gangs were rivals. Likewise, there was no allegation that the defendant committed these acts, and as such they do not constitute other crimes evidence. See *People v. Pikes*, 2013 IL 115171, ¶ 20 (evidence regarding a prior crime not committed by the defendant is not an "other crime" for the purposes of the other-crimes doctrine). As such evidence regarding incidents of violence between MMG and 200 Gang are admissible so long as their probative value is not substantially outweighed by their prejudicial value. See *id.* ¶ 26. In the instant case it was not an abuse of discretion for the trial court to find that the probative value outweighed any prejudice towards the

defendant, particularly when considered in light of Kajuan's testimony that it had been a while since 200 Gang and MMG had problems.

¶ 83 Defendant next argues that the "voluminous" social media posts regarding Amari, Exodus, and Kirkwood's gang associations were irrelevant and prejudicial, as they did not serve to explain defendant's motive for the crime. We disagree. First, the so called voluminous social media posts amounted to nine photographs or screenshots. Second, defendant's friends' affiliation with the 200 Gang was relevant to show defendant's motive. The State's theory was that avenging Kirkwood's death was the primary motivation for Buck's murder. Therefore, Kirkwood's affiliation with the 200 Gang is relevant. We also know that defendant returned to Orchard Road with Exodus, Justin, and Amari. Accordingly, their affiliation with the 200 Gang is likewise relevant.

¶ 84 Defendant also argues that his Facebook post regarding his knowledge of Four Corner Vice Lords law should not have been admitted as there was no evidence that the laws of the Four Corner Vice Lords played any part in Buck's death. While that may be the case, defendant's statement that he recites portions of the law every day in the mirror indicates just how seriously defendant treated his gang membership, which corroborates the State's theory that defendant was willing to kill Buck in order to avenge his fellow gang members.

¶ 85 In the case at bar the trial court acted within its discretion in admitting the gang evidence. The State's theory of the case was that the shooting was the result of gang-based violence which had begun much earlier in time with the death of several individuals associated with rival gangs and its members. The usage of various gang-related insults and taunts between the two groups, as well as the flashing of gang signs, substantiated this theory and helped to explain what occurred that evening.

¶ 86    Finally, defendant argues that the trial court committed reversible error by admitting and publishing the two rap videos (People's Exhibit Nos. 13 and 15) as they were unduly prejudicial and should not have been admitted. In response, the State argues that defense counsel invited the supposed error by affirmatively agreeing with the redactions to the videos and then not objecting to their admission. The State argues that this constitutes invited error. We agree with the State that any error in admitting the rap videos was invited. "[A] defendant's invitation or agreement to the procedure later challenged on appeal 'goes beyond mere waiver.' " *People v. Harvey*, 211 Ill. 2d 368, 385 (2004) (quoting *People v. Villarreal*, 198 Ill.2d 209, 227 (2001)). The issue is sometimes referred to as one of estoppel. *Id.* That is, under the doctrine of invited error, a defendant may not request to proceed in one manner and later contend on appeal that the course of action was in error. *Id.* To allow a defendant to use the exact ruling or action procured in the trial court as a vehicle for reversal on appeal would offend notions of fair play and encourage defendants to become duplicitous. *Id.* It would also deprive the State of the opportunity to cure the alleged defect. *People v. Bush*, 214 Ill. 2d 318, 332 (2005).

¶ 87    The instant case presents a somewhat unusual set of circumstances. At the hearing on the State's motion *in limine*, defendant objected to the admission of the rap videos in their entirety and subsequently renewed that objection in his posttrial motion. However, after the motion *in limine*, defendant was given the opportunity to suggest any redactions he felt should be made to the videos and he ultimately came to an agreement with the prosecution as to what portions should be redacted and did not object to the publishing of the two rap videos. In fact, defense counsel brought attention to the videos in his opening statement to the jury.

¶ 88    To preserve an issue for review in a criminal case, "a defendant must raise it in either a motion *in limine* or an objection at trial, and in a posttrial motion." (Emphasis in original.)

*People v. Denson*, 2014 IL 116231, ¶ 18. In the instant case defendant satisfied the elements necessary to preserve the issue of admissibility of the rap videos for review. We point out that defendant's posttrial motion did raise the alleged error of presenting more evidence of gang affiliation than necessary to support their motive of the case. Hence, a plain-error review is not necessary under this circumstance. However, he also acquiesced in the admission of the videos in their entirety when given the opportunity to redact portions. The record clearly illustrates defendant acquiesced to the redacted versions of the videos and did not object to them being played for the jury. Accordingly, defendant invited and agreed to the error now raised on appeal and is now estopped from asserting it as error.

¶ 89                                    C. Ineffective Assistance

¶ 90        Defendant argues that he received ineffective assistance of counsel in that his trial counsel failed to object to inadmissible hearsay statements. Specifically, defendant points to Holton's testimony that Kajuan and the defendant had a gang related beef in which defendant blamed Kajuan for killing one of his friends:

> "Q. Do you know, was there any beef between Scotty and Buck?
>
> * * *
>
> A. No, not to my knowledge.
>
> Q. Do you remember talking to Detective Bierbaum back on April 16th of 2019?
>
> A. Yes.
>
> Q. And that—was that up in Chicago?
>
> A. Yes.

Q. Do you remember—do you remember telling Detective Bierbaum, [']I don't know, this beef been going on, I guess, you know, before I even came down here; before I even came down here, you see what I'm saying.['] Do you remember telling that to Detective Bierbaum when asked about the beef between Scotty and Buck?

A. Yes

\* \* \*

Q. Did the beef involve Buck's brother?

A. Yes.

Q. Who is Buck's brother?

A. Kajuan.

Q. Do you know what the beef was?

A. No, I don't.

\* \* \*

Q. (By Mr. Rigdon) Do you know—do you know what the—what they thought the relationship was between Scotty and the little brother?

A. Gang—gang-related probably. That's about it.

Q. What gang-related problem?

A. The gang that they have. I don't—I don't hang around them so I don't know.

Q. During that—during that same interview, do you remember telling Detective Bierbaum, [']Man, I don't know; they blame him for something.[']

- 33 -

Detective Bierbaum then asks you, [']What are they blaming him for?['] Your response is, [']I don't know; killing one of his homies, I guess?[']

A. Yes.

Q. Do you remember telling Detective Bierbaum that?

A. Yes."

Defendant argues that Holton's statements to Bierbaum were not admissible as prior inconsistent statements, as Holton did not have personal knowledge of the beef between Kajuan and defendant, and that trial counsel's failure to object constituted ineffective assistance of counsel.

¶ 91　　　　Defendant likewise argues that Holton's statement that prior to being shot, he heard Buck say to defendant, "Keep my little brother out of this; he ain't got nothing to do with it," was inadmissible hearsay as it was being offered for the truth of the matter asserted. Further, it was unreliable, because Holton was unable to hear defendant and Buck's prior conversation, despite them standing in the same locations. Defendant maintains that trial counsel's failure to object to that testimony also constituted ineffective assistance.

¶ 92　　　　Defendant also argues that Wright's statements regarding the conversation he had with Buck in his car prior to the shooting were inadmissible hearsay, and that trial counsel was ineffective for failing to object to the introduction of these statements. Defendant additionally argues that the call with Rials was inadmissible for multiple reasons. First, the portion of the phone call identifying defendant as Buck's killer was inadmissible as a prior inconsistent statement because the statements were not inconsistent with his testimony that he did not see anyone near Buck after the shooting began or that the only person he saw shooting was Buck. The rest of his conversation with Rials related to his prior conversation with Buck and was inadmissible hearsay. Accordingly, trial counsel's failure to object constituted ineffective assistance of counsel.

¶ 93    Regarding Wright's conversation with Buck prior to the shooting, the State maintains that defendant's failure to object was a matter of trial strategy and therefore not ineffective assistance of counsel.

¶ 94    To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation "fell below an objective standard of reasonableness" and that such a shortcoming was prejudicial in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 687-94 (1984); see *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting *Strickland*). Matters of trial strategy are "virtually unchallengeable" on ineffective assistance grounds. "As a general rule, trial strategy encompasses decisions such as what matters to object to and when to object." *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991). To prevail on a claim for ineffective assistance counsel regarding a matter of trial strategy, defendant must show that counsel's strategy was objectively unreasonable. *Id.*

¶ 95    In defendant's first answer to discovery, defendant indicated he would be raising self-defense. Likewise at a hearing on the State's motion to continue trial, defense counsel indicated defendant would be raising self-defense and testifying at trial. While defendant ultimately chose not to raise self-defense or testify, defendant's strategy in closing argument was to paint Buck as the aggressor. Trial counsel argued that it was Wright's phone call to Amari which summoned defendant and his friends to return to Orchard Road after leaving for the bowling alley, whereupon an intoxicated and angry Buck fired 14 rounds at them.

¶ 96    The decision not to object to Holton's statements regarding the beef between Buck and defendant, or Wright's statements regarding Buck's concerns about defendant and Kajuan, are consistent with trial counsel's strategy to paint Buck as the aggressor. We see further proof of this

strategy in trial counsel's cross examination of Wright, where trial counsel chose to emphasize Buck's statements regarding Kajuan and defendant:

"Q. Then you stated that Buck said, [']I ain't going to play if they keep tweaking on my brother,['] correct?

A. Yes.

Q. And then you told Detective Bierbaum that Buck had a gun, correct?

A. Yes."

Trial counsel again emphasized Buck's concern regarding his brother, when he introduced a Facebook conversation between Buck and Facebook user Najah Pøøh in which Buck stated, "Shit on the block about to get in it for my boy."

¶ 97 As trial counsel's decision not to object to Holton and Wright's testimony appears to have been part of a deliberate strategy to paint Buck as the aggressor, defendant must show that counsel's strategy was objectively unreasonable. Taken as a whole, while defendant's dispute with Kajuan provided him with a motive to kill Buck, it likewise provided Buck with a motive to shoot defendant. Given Wright's testimony that it was Buck who sought out defendant when he returned to Orchard Road, and Holton's testimony that Buck told defendant to keep Kajuan out of this immediately prior to the shooting and that Buck fired 14 rounds hitting the defendant, it was not an unreasonable strategy for counsel to argue that Buck was the aggressor in the situation.

¶ 98 Moving to the portion of the phone call between Rials and Wright in which Wright identifies defendant as Buck's killer, the State argues that the phone call was admissible as a prior inconsistent statement, as it was Wright's testimony at trial that he did not see anyone near Buck at the time of the shooting and that he only saw Buck fire a gun. The phone call with Rials is

largely consistent with Wright's testimony at trial. The only portion which was not consistent with his testimony at trial was his identification of defendant as Buck's killer.

¶ 99        "When a prior inconsistent statement meets the basic requirements of reliability under section 115-10.1 of the Code [of Criminal Procedure of 1963], either party in a criminal case may introduce the prior inconsistent statement as substantive evidence." *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 61. Section 115-10.1 (725 ILCS 5/115-10.1 (West 2020)), provides that a prior inconsistent statement is admissible where the witness is subject to cross-examination; the statement narrates, describes, or explains an event of which the witness had personal knowledge; and the witness acknowledges making the statement under oath or the statement was accurately recorded. In the instant case the phone call was recorded by the jail's phone system and Wright acknowledged making the statement. It was therefore admissible as substantive evidence under section 115-10.1. As there was no basis to object to the phone call's admission as an improper prior inconsistent statement, trial counsel was not ineffective for failing to raise that objection.

¶ 100                                  III. CONCLUSION

¶ 101        For the reasons stated, we affirm the trial court's judgment.

¶ 102        Affirmed.