NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 240090-U

NO. 4-24-0090

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 21, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| SCOTT A. ALLEN, | ) | No. 19CF607 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | J. Jason Chambers, |
| | ) | Judge Presiding. |

JUSTICE STEIGMNANN delivered the judgment of the court.
Presiding Justice Harris and Justice Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed the trial court's summary dismissal of defendant's postconviction petition, concluding that defendant failed to state the gist of a constitutional claim when, taking as true the facts alleged in defendant's petition, (1) trial counsel did not render ineffective assistance when he pursued a reasonable "all-or-nothing" defense strategy instead of a theory of self-defense, (2) counsel did not render ineffective assistance when he did not pursue a theory of second degree murder, and (3) defendant's 50-year aggregate sentence, which was one year over the possible minimum, did not violate the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 2    Defendant, Scott A. Allen, was convicted of three counts of mob action (720 ILCS 5/25-1(a)(1) (West 2018)), aggravated discharge of a firearm (*id.* § 24-1.2(a)(1)), and three counts of first degree murder (*id.* § 9-1(a)(1), (2)), arising from the shooting death of Juan Nash. Defendant was 18 years old at the time of the crimes. The trial court sentenced defendant to an aggregate sentence of 50 years in prison—45 years for the first degree murder conviction, with a mandatory firearm enhancement, and 5 years for the aggravated discharge of a firearm conviction.

The court imposed a three-year concurrent sentence for mob action. On appeal, this court affirmed. *People v. Allen*, 2022 IL App (4th) 200554-U, ¶ 102.

¶ 3            In October 2023, defendant *pro se* filed a petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)), alleging (1) trial counsel rendered ineffective assistance when he did not present a theory of self-defense, (2) counsel rendered ineffective assistance when he failed to request a second degree murder instruction, and (3) defendant's 50 year aggregate prison term was a *de facto* life sentence that, as applied to him based on his age and immaturity, violated the Illinois Constitution's proportionate penalties clause (Ill. Const. 1970, art. I, § 11) and entitled him to protections similar to those afforded to juvenile offenders by *Miller v. Alabama*, 567 U.S. 460 (2012). The trial court summarily dismissed the petition at the first stage of postconviction proceedings, finding defendant could have raised the issues on direct appeal and noting it addressed defendant's age and immaturity when it sentenced him.

¶ 4            Defendant appeals, arguing that he stated the gist of a constitutional claim that trial counsel provided ineffective assistance when he (1) did not present a theory of self-defense and instead took an "all-or-nothing" approach and (2) failed to request a second degree murder instruction. He also argues that he stated the gist of a constitutional claim that his aggregate 50-year prison sentence was a *de facto* life sentence that violated the Illinois Constitution's proportionate penalties clause as applied to him because he was an emerging adult at the time of the offense. We disagree and affirm the trial court's dismissal of his postconviction petition.

¶ 5            I. BACKGROUND

¶ 6            Portions of the following facts were recited in this court's disposition of defendant's direct appeal. See *Allen*, 2022 IL App (4th) 200554-U, ¶¶ 5-52. Additional facts not relevant to

this appeal may also be found there.

¶ 7                                       A. The Shooting

¶ 8            On April 2, 2019, a block party was held on Orchard Road in Bloomington, Illinois, to commemorate the life of David "Vido" Parks. Three videos taken at the party that were shared on social media were admitted into evidence. The videos showed Nash and others drinking and smoking what appeared to be cannabis. Defendant responded to one of the videos, and the person who posted it invited him to come to the party. A video taken after dark showed defendant at the party wearing a fanny pack.

¶ 9            At some point, Nyrisha James, Brooklyn Turner, and Donnae Yates met up with defendant and his friends, Justin Walls, Amari McNabb, and Exodus Herbert. They all then drove to the party on Orchard Road. Defendant, Turner, James, Herbert, and Walls were in James's car. McNabb was in Yates's car with Yates and another girl. Defendant and some of his friends left the party to go to a bowling alley in Bloomington. Surveillance video from the bowling alley showed defendant, McNabb, Herbert, and Walls arriving in a red sedan around 9:21 p.m. Defendant and Walls were wearing fanny packs slung across their chests.

¶ 10           Around 9:35 p.m., Turner, driving James's car, drove defendant and his friends back to the party. As they got out of the car, they told James not to leave. A few minutes later, Herbert jogged back to the car and told James it was too cold out there for him. After that, there was an exchange of gunfire in which defendant, Nash, and Nash's friend, Nathaniel Caldwell, were shot.

¶ 11           After hearing the gunshots, Turner tried to leave. As she did so, Herbert grabbed the steering wheel and said, "Don't leave my brothers." Defendant, McNabb, and Walls then returned to the car and told her defendant had been shot. Turner then drove them to the hospital.

Security video from the hospital showed defendant and his friends enter the hospital around 9:54 p.m. It then showed McNabb, Herbert, and Walls leaving about 30 seconds later.

¶ 12    Nash, who had been fatally wounded, drove north down Orchard Road in Caldwell's truck, before eventually crashing into a home. Police arrived shortly before 10 p.m. to find Nash slumped over in the driver's seat of the truck. He was later pronounced dead at the hospital. Defendant was subsequently arrested.

¶ 13    B. Pretrial Motion To Continue

¶ 14    Before trial, the trial court conducted a hearing on the State's motion to continue in order to receive the results of a gunshot residue test performed on swabs taken from defendant's hands at the hospital. During defense counsel's argument opposing the continuance, the following colloquy occurred:

"THE COURT: Okay. And I am assuming, [defense counsel], there can be no stipulations based upon the nature of this evidence that could be entered into to resolve this particular issue?

[DEFENSE COUNSEL]: Judge—Judge, I apologize. I was reluctant to go down this road, but after talking with my client we have filed an affirmative defense in this case. [Defendant] is going to be taking the stand, and he is going to be arguing self-defense, and he is not going to be arguing with the State that he discharged a firearm.

So I—I don't think that the evidence the State's requesting is—is even—is necessary at all."

Counsel also told the court defendant was willing to stipulate he fired a firearm and had gunshot residue on his hands. The court granted the motion to continue. The record reflects that, ultimately,

gunshot residue was not found on defendant's hands.

¶ 15                              C. Trial Evidence

¶ 16                              1. *Nathaniel Caldwell*

¶ 17          At trial, Caldwell testified he drove to the party in his truck. He parked on the street near a driveway and recalled seeing defendant, McNabb, and Herbert arrive in a gray car. When the shooting occurred, Caldwell was in the rear driver's side seat of the truck, talking with another man, Daronte Thomas, who was in the rear passenger seat. Caldwell heard shots coming from the direction of the front of the truck and began to run toward the rear of the truck and the sidewalk. He was shot three times, once through the leg, once through the shoulder, and once in the back. After the gunfire ended, Caldwell laid behind a car until help arrived. He did not see who fired the shots and did not know where Nash, defendant, McNabb, and Herbert were located. He recalled hearing two groups of shots and that they sounded different. Caldwell admitted to being intoxicated that day.

¶ 18                              2. *Daronte Thomas*

¶ 19          Thomas testified he did not recall exactly who was at the party because he was drunk and had been smoking cannabis. He also could not recall anything about an interview he had with Detective Jared Bierbaum, the lead detective in the case. However, Thomas recalled seeing a muzzle flash in his peripheral vision and hearing shots. He then ran away from the area. He returned after the gunfire had ceased, found Caldwell had been shot, and stayed with Caldwell until an ambulance came.

¶ 20          Due to Thomas's inability to recall some of the events, edited portions from a recorded interview Thomas gave to Bierbaum were played for the jury. In that interview, Thomas described seeing between three and four younger individuals. He described their features and

clothing, which generally matched the features and clothing of defendant and his friends. Thomas recalled the group walked past him to speak with Nash, who was near the sidewalk, and they were standing around five feet away from Nash. Thomas was talking with other people when he heard shots. From his peripheral vision, he saw muzzle flashes coming from the general area of the group toward Nash. He then ran away. He recalled that there was a set of shots, a pause, then another set of shots.

¶ 21                                      3. *Michael Holton*

¶ 22          Michael Holton, Nash's brother-in-law and an attendee of the party, testified there were around 15 people at the party at the time of the shooting. Holton was leaning against the hood of Caldwell's truck and saw defendant arrive with McNabb. Defendant was wearing a fanny pack. McNabb, defendant, and Nash had a conversation, and defendant and McNabb then walked off away from the group. About 5 or 10 minutes later, McNabb and defendant came back. Nash said to them, "Keep my little brother out of this; he ain't got nothing to do with it." Holton then saw a muzzle flash and saw defendant fire a gun at Nash. Holton ducked and ran away.

¶ 23          Holton was cross-examined regarding his account of the shooting that he had provided in previous interviews with Bierbaum and another detective. During that interview, Holton initially denied knowing if there was a "beef" between defendant and Nash. He later admitted there was a beef between the two that involved Nash's younger brother, Kajuan Hopson. Holton theorized the issue might have been due to "killing one of his homies."

¶ 24          Holton had told the detectives defendant "upped" a gun, and defense counsel questioned Holton regarding statements he made when the detectives asked how Holton knew that. In the interview, Holton said he knew defendant "for having guns on him" and said, "I know his demeanor sometimes." When asked, "How do you know for sure that he upped the gun?" Holton

told detectives, "I know him to carry a gun." Bierbaum then told him there was a big difference between knowing defendant to carry guns and seeing him "up a gun." Holton did not specifically say he saw defendant use a gun, and he also said to the detectives, "I ain't going to lie to you; I was—I was drinking." Holton also admitted to smoking marijuana that day.

¶ 25                              4. *Shawndell Wright*

¶ 26        Shawndell Wright, another party attendee, testified he knew defendant because defendant was the best friend of his deceased brother, Steven Alexander. Alexander was also known as LS or Little Steve. Wright said his best friends were Vido and Nash. While Wright was at the party, he saw defendant, McNabb, Herbert, and another man he did not know arrive. After the four left, Wright called McNabb, who told Wright to "move around," which he understood to be a warning to get out of the area. Wright stayed at the party and spoke to Nash, who was talking about issues Hopson had been having with defendant and his friends. The group then returned, and Nash got out of the car, saying that he was going to "go holler" at them. Nash then stood in front of the car, with defendant and his friends huddled in a circle. About 10 to 15 minutes later, Wright heard two shots, looked up, and saw Nash fall to the ground and begin shooting. He did not see who fired the first shots, but those shots sounded different than the shots Nash fired. He did not see anyone else in the area besides Nash. After the shooting stopped, Nash got up, got into Caldwell's truck, and drove off.

¶ 27        The State asked Wright about earlier statements he had made during a recorded telephone conversation with a jail inmate, in which he discussed the shooting. In that call, Wright identified defendant as Nash's killer. Portions of the call were read and later played in response to Wright's testimony that he did not see anyone fire a gun except Nash.

¶ 28        The defense sought to establish Wright was coerced into identifying defendant as

the shooter, and defense counsel extensively cross-examined him regarding an interview he gave with Bierbaum. During the interview, Wright initially did not speak with Bierbaum for over an hour. After Bierbaum stated he would be telling the prosecutor whether or not Wright cooperated, Wright began speaking with Bierbaum. Bierbaum asked if Wright had received a phone call from McNabb before the shooting, and Wright said yes. However, McNabb's phone records showed that Wright was the one who called McNabb. Defense counsel questioned Wright on that point in the following colloquy:

> "Q. And in response you say, He called me and told me to move around, correct?
>
> A. Yes.
>
> Q. But he didn't call you; you called him—
>
> A. I called, yes.
>
> Q. —correct?
>
> Did you just make this up because Detective Bierbaum was threatening you and prompting you, basically, to say exactly that?
>
> A: Yes.
>
> * * *
>
> Q. So is it your testimony that you only say that you were told to move around because of the way that interview played out and the threats that were made against you?
>
> A. Yes."

¶ 29                    5. *Physical Evidence and Autopsy*

¶ 30        The police recovered multiple items of evidence from the crime scene, including

cartridge cases and fragments from multiple different caliber bullets. Defendant and Caldwell were treated for their injuries at a local hospital. A 9-millimeter bullet was recovered from defendant's body. A 9-millimeter bullet was also recovered from Caldwell's body.

¶ 31 An autopsy was performed on Nash by Dr. John Scott Denton. Nash had been shot four times. He had been shot through the heart by a .25-caliber bullet, which was found lodged in his spine. He was shot in the lower left arm by a .38-caliber bullet, which fractured his radius and ulna. Those bullets matched bullets and cartridge cases found at the crime scene. An unfired Winchester 9-millimeter cartridge was also located in Nash's pocket. Nash died as the result of the .25-caliber shot that pierced his heart.

¶ 32 Defendant's Facebook records showed that, on March 28, 2019, he was discussing obtaining guns and ammunition for a Facebook user with the name "Al Al Pacino." On April 2, 2019, Al Al Pacino sent defendant three images of a Beretta 950 Jetfire handgun taken from Wikipedia. That handgun fires a .25-caliber cartridge. Records taken from McNabb's cell phone showed that, on April 2, 2019, McNabb searched Google for images of a GT .380 pistol.

¶ 33 6. *Lack of Gunshot Residue on Defendant's Hands*

¶ 34 Detective David Ashbeck testified he went to the hospital after the shooting to collect evidence. Ashbeck collected a sample from defendant's hands to test for gunshot residue. When he did so, defendant was lying shirtless in a hospital bed. Defendant took his hand out from underneath the blanket as Ashbeck collected the samples. The result of the test was negative for gunshot residue.

¶ 35 The forensic scientist who analyzed the test concluded defendant may not have discharged a firearm, and if he did, the particles were either not deposited, removed, or not detected by the test. She testified that activities such as removing a shirt, rubbing one's hands against

something, or washing could potentially remove deposited gunshot residue particles.

¶ 36                           7. *Gang Activity*

¶ 37        The State presented extensive evidence concerning defendant's gang activity. Bloomington police officer Jack McQueen was accepted as an expert in gang crime analysis and testified that tattoos indicated Nash was a member of the Black Disciples gang.

¶ 38        Facebook photos of McNabb were admitted into evidence associating him with gang activity and showing him wearing a tribute shirt that had been distributed among members of another gang following the death of Alexander, which occurred the summer before Nash's death. McQueen also testified he had watched a rap video entitled "Cappin for LS," in which he observed McNabb making a gang hand sign. Photographs of Herbert were admitted into evidence associating him with two gangs.

¶ 39        Photographs from Trevonte Kirkwood's social media account were admitted into evidence connecting him to gangs associated with defendant, McNabb, and Herbert. Kirkwood was murdered in October 2018.

¶ 40        A record of a Facebook conversation between defendant and defendant's cousin, Marcel Mayoyo, on April 30, 2019, was admitted into evidence. In that conversation, Mayoyo told defendant he was on a bus heading to downtown Bloomington and was being followed by Hopson, who was a rival gang member who had robbed him. Mayoyo indicated he believed Hopson had a gun. He also described a past confrontation with Hopson. Defendant stated, "We on they ass."

¶ 41        A video was played for the jury in which defendant was singing. The video displayed a still image of Herbert and defendant standing together with Herbert displaying gang signs and defendant flipping off the camera. The lyrics of the song referred to flashing a gang sign and doing a "drive-by" or shooting rival gang members with either a Glock 33 or an extended

round magazine handgun.

¶ 42 The rap video "Cappin for LS" was played for the jury. The video included a photo of Alexander with the words "Long Live Lil Steve" underneath. The video showed defendant holding a handgun near his face and donning a ski mask. It also featured McNabb holding two bags of what appeared to be marijuana. Later in the video, defendant can be seen wearing a fanny pack slung across his chest and pointing a handgun at the camera. McQueen explained that, from January 2019 through April 2019, the police had seen an increase in the use of fanny packs to carry handguns.

¶ 43                                  8. *Kajuan Hopson*

¶ 44 Hopson testified that defendant, McNabb, Herbert, and a person he referred to as "Main," whom the record indicates was possibly Mayoyo, were associated with a local gang. Hopson said he was not in a gang but was friends with members of another local gang. He also testified that Nash was not in a gang. However, Hopson acknowledged he had previously told Bierbaum that he and Nash were both Black Disciples. Likewise, Hopson testified he did not know Caldwell's gang association but had previously told Bierbaum Caldwell was a Black Disciple. Hopson did not know what gang Vido had associated with. He indicated Alexander had been a member of a rival gang.

¶ 45 Hopson did not think Alexander's death was related to Nash's death. However, he did believe Nash's death might be related to Kirkwood's death. He believed the gang associated with defendant and his friends blamed Hopson for Kirkwood's death and, because they could not get to him, they killed Nash. However, Hopson had not fought, argued with, or received threats from defendant, McNabb, Herbert, or their gang. Nevertheless, Hopson had previously told police that he had received threats from defendant's cousin, Main. He also had previously told police he

believed Nash's death may have been a setup by Wright and another man.

¶ 46                                              9. *Closing Arguments*

¶ 47          During closing arguments, defense counsel focused on (1) Holton's lack of credibility and (2) evidence that defendant was shot while running away from Nash. Counsel particularly noted defendant's hands were negative for the presence of gunshot residue. Counsel also noted others were charged with murder in the case and questioned why Walls, who had also been seen wearing a fanny pack, was not charged.

¶ 48                                              10. *The Jury Verdict*

¶ 49          The jury found defendant guilty of three counts of first degree murder, aggravated discharge of a firearm, and mob action. The jury also found defendant personally discharged a firearm that proximately caused the death of another person.

¶ 50                                         D. The Sentencing Hearing

¶ 51          The presentence investigation report (PSI) showed defendant had a history of juvenile offenses involving firearms and a pending adult charge of aggravated unlawful use of a weapon. His first contact with police was when he was nine years old for mob action and battery. He had numerous problems in school, with multiple disciplinary actions. He graduated high school through an online program.

¶ 52          Defendant reported he was raised by his mother and maternal grandmother. He reported being " 'super close' " with his mother and " 'kind of close' " with his father. Defendant had been diagnosed with bipolar disorder and attention-deficit/hyperactivity disorder. He had previously been treated for various mental-health issues and provisionally diagnosed with posttraumatic stress disorder (PTSD). Defendant reported alcohol and drug use and that he had previously entered a treatment program but was unsuccessfully discharged. The PSI noted

defendant had struggled with unaddressed mental-health issues for the majority of his life.

¶ 53 Defendant presented a number of letters in mitigation describing his good character and asking for lenience.

¶ 54 The State noted defendant was facing a minimum aggregate sentence of 49 years in prison and a maximum of life imprisonment. The State argued defendant had an extensive history of gang activity and a criminal history involving weapons. The State asked the trial court to sentence defendant to 70 years for first degree murder, 10 years for aggravated discharge of a firearm, and 3 years for mob action.

¶ 55 Defense counsel noted defendant was 20 years old at the time of sentencing. Counsel asked for 45 years in prison, arguing in part that defendant was an "immature kid" and "not a grown man."

¶ 56 Defense counsel did not specifically raise a proportionate penalties argument to the trial court. However, after discussing aggravating and mitigating factors, the court nevertheless stated as follows:

> "There are some technical issues here that the Court wants to go over for the record in terms of where things are at as well. At the time of the shooting, you were 18 years old. Eighteen years, nine months and one day is actually how old you were at the time this happened. The United States Supreme Court in [*Miller v. Alabama*, 567 U.S. 460 (2012), *Graham v. Florida*, 560 U.S. 48 (2010), *Roper v. Simmons*, 543 U.S. 551 (2005),] all dealt with sentencing juvenile offenders to possible life sentences. And the Court is very familiar with that line of cases.
>
> The Illinois Supreme Court in [*People v. Buffer*, 2019 IL 122327,] has also said that a 40-year life sentence or 40-year sentence for a juvenile is a *de facto* life

sentence. And in order for the Court to go over 40 years in any type of sentence, they have to make certain findings. It has to go through an analysis before it can do that. And this is a situation to where you are not a juvenile. I must—it might be nine months and one day, because under 18 we would have been dealing with that line of cases. But that's not the situation here. You are an adult, and that's the way the Court is sentencing things. So, I'm not limited, and I don't have a limitation of [*Buffer*] that the Illinois Supreme Court put in place. But that doesn't prevent the Court from considering a similar analysis that the *Buffer* court used in the analysis of that particular situation.

In that situation, the Court used language, the crime reflects a transient immaturity of youth. The Court noted the defendant lacked maturity and a fully developed sense of responsibility, which leads to dangerous behavior that is careless, impulsive, and reckless. And, frankly, when I looked at the facts of that case, when I have looked at the situation of this case, I couldn't find a more perfect description as to what happened in this particular situation. That's pretty much what happened.

The Court notes in *Buffer* that the Supreme Court said a person is vulnerable to negative influences and outside influences. And, again, we're dealing with a gang situation here that turned bad. And the Court, unfortunately, now has to deal with that situation. And the Court would look at that situation as well. So, totality, I am considering that. Not limited to all of that information, but I am considering all of that.

And so, that brings me to where I'm at with regard to the sentence. The

legislature, when it addressed the gun enhancement in that particular case, made it clear that gun offenses and gun violence will not be tolerated. And under nearly all circumstances in this case, when I have all the aggravating factors, that I would have anything close to a minimum sentence in this case would not be considered by the Court. But the legislature has also put in certain factors here that even make this minimum sentence in this case significant. And so, the Court is looking at that as well."

The court then sentenced defendant to the minimum terms of 20 years for first degree murder and 25 years for the firearm enhancement. The court sentenced defendant to five years in prison, one year over the minimum, for aggravated discharge of a firearm, to be served consecutively. The court sentenced defendant to a concurrent three-year term for mob action.

¶ 57 Defendant filed a motion to reconsider, alleging the sentence was a *de facto* life sentence that was unconstitutional as applied to him because he was 18 years old at the time of the crime. He also argued the firearm enhancement was unconstitutional as applied. At the hearing on the motion, the trial court noted it sentenced defendant to the minimum terms for first degree murder and the firearm enhancement. The court explained it went one year over the minimum for aggravated discharge of a firearm because of defendant's juvenile criminal history and because he was on probation at the time of the offense. Thus, the court denied the motion.

¶ 58 E. The Direct Appeal

¶ 59 On direct appeal, defendant raised three issues, arguing (1) the State failed to prove him guilty beyond a reasonable doubt because the testimony of Holton and Wright was too unreliable to establish guilt, (2) the trial court erred by admitting prejudicial evidence of defendant's gang affiliation, and (3) he received ineffective assistance of counsel when counsel

failed to object to hearsay statements. This court affirmed. *Allen*, 2022 IL App (4th) 200554-U, ¶ 102.

¶ 60                                    F. The Postconviction Petition

¶ 61            In October 2023, defendant *pro se* filed a petition pursuant to the Post Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)), alleging (1) trial counsel rendered ineffective assistance when he did not present a theory of self-defense and instead chose to argue the State failed to prove defendant was the shooter; (2) counsel rendered ineffective assistance when he failed to request a lesser-included offense instruction, indicating, from a reference to "mitigating circumstances" and a case citation, that counsel should have tendered a second degree murder instruction; and (3) defendant's 50-year aggregate prison sentence was a *de facto* life sentence, in violation of the Illinois Constitution's proportionate penalties clause, which entitled him to protections similar to those afforded to juveniles under *Miller*.

¶ 62            Defendant attached to his petition an affidavit, in which he averred he returned to the party after Nash called him and told him they needed to talk. According to defendant, when he arrived, Nash asked him if he had a problem with Nash or Hopson. When defendant told Nash that Hopson might not want to talk with him because defendant heard Hopson had something to do with Kirkwood's death, Nash became aggressive and threatened to "smoke" one of defendant's group. Defendant realized the situation with Nash was not going in a positive direction, and he turned and started to walk away. Defendant then heard a shot and felt a pain in his lower back. As he was falling to the ground, he turned his head and saw Nash pointing a gun at him. Defendant then fired three to four shots in Nash's direction, and Nash shot defendant in his hip. Defendant attempted to run but could barely stand up. He averred, "[T]hat[']s when [Walls] shot Nash in an attempt to save my life." He further wrote, "I would be dead right now if [Walls] wasn't there

- 16 -

because [Nash] was walking towards me with his gun pointed at me and he was about to finish me off and [Walls] came to my rescue when he didn't have to."

¶ 63      Defendant averred he told counsel the facts alleged in his petition and affidavit and counsel responded he would raise the affirmative defense of self-defense. Defendant also noted counsel's statement to the trial court at the hearing on the State's motion for a continuance that defendant would raise self-defense. Defendant wrote he was under the impression that self-defense would be the strategy at trial until "in the Eleventh hour," and after the jury was chosen, counsel informed him he was changing the "trial strategy" of self-defense to "no defense at all." Defendant stated he did not agree with the strategy because Nash shot him in the back and tried to kill him and defendant would be dead but for Walls shooting Nash to save defendant's life.

¶ 64      Defendant further averred counsel admitted to him after trial that counsel "knew that it was his fault why we lost at trial" and counsel would be willing to admit that in postconviction proceedings. Defendant wrote that counsel told him "how bad he felt about the way he handle[d] my defense or lack thereof."

¶ 65      Regarding defendant's proportionate penalties claim, he argued that because he was only an 18-year-old young adult when the crime occurred and received a *de facto* life sentence, he should have been afforded the type of heightened protection for sentencing juveniles required by *Miller*. Defendant alleged he was raised in poverty and he and his siblings were often left alone, with no parental supervision. He alleged his neighborhood was full of gangs, drugs, and guns and joining a gang was necessary for self-protection. He alleged he had been robbed and stabbed when walking to school. He also alleged he carried a gun for protection and noted his previous PTSD diagnosis. Defendant also attached to the petition evidence of studies addressing the brain development of emerging adults, suggesting people ages 18 to 24 are not yet fully mature adults

because the brain is still developing at that age.

¶ 66        The trial court summarily dismissed the petition, finding the issues forfeited because they could have been raised on direct appeal. The court also noted defendant did not specify the lesser-included offense instruction he sought. The court further found it had specifically considered defendant's age and immaturity at sentencing.

¶ 67        This appeal followed.

¶ 68                                II. ANALYSIS

¶ 69        Defendant appeals, arguing that he stated the gist of a constitutional claim that trial counsel provided ineffective assistance when he (1) did not present a theory of self-defense and instead took an "all-or-nothing" approach and (2) failed to request a second degree murder instruction. He also argues that he stated the gist of a constitutional claim that his aggregate 50-year prison sentence was a *de facto* life sentence that violated the Illinois Constitution's proportionate penalties clause as applied to him because he was an emerging adult at the time of the offense. We disagree and affirm the trial court's dismissal of his postconviction petition.

¶ 70                        A. Ineffective Assistance of Counsel

¶ 71        Defendant contends he stated the gist of a constitutional claim that trial counsel provided ineffective assistance when he (1) did not present a theory of self-defense and instead took an "all-or-nothing" approach and (2) failed to request a second degree murder instruction.

¶ 72                                1. *The Applicable Law*

¶ 73                        a. The Post-Conviction Hearing Act

¶ 74        The Act provides a collateral means for a defendant to challenge a conviction or sentence for a violation of a federal or state constitutional right. *People v. Jones*, 211 Ill. 2d 140, 143 (2004). At the first stage of postconviction proceedings, the trial court must determine, taking

the allegations as true, whether the defendant's petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2022). A postconviction petition may be summarily dismissed as frivolous or patently without merit "only if the petition has no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 12 (2009). "A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation. An example of an indisputably meritless legal theory is one which is completely contradicted by the record." *Id.* at 16. At this stage of proceedings, the court acts in an administrative capacity and screens out postconviction petitions that lack legal substance or are obviously without merit. *People v. Tate*, 2012 IL 112214, ¶ 9. The allegations of the petition, taken as true and liberally construed, need only present the gist of a constitutional claim. *People v. Harris*, 224 Ill. 2d 115, 126 (2007). We review *de novo* the summary dismissal of a postconviction petition. *Id.* at 123.

¶ 75                                   b. Ineffective Assistance of Counsel

¶ 76            "To demonstrate ineffective assistance of counsel, a defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "A reasonable probability is a probability which undermines confidence in the outcome of the trial." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 84. "Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim." *Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland*, 466 U.S. at 697).

¶ 77            Under the first prong, counsel is afforded wide latitude when making tactical

decisions, and the law presumes counsel will faithfully fulfill his or her role envisioned by the sixth amendment (U.S. Const., amend. VI). *Strickland*, 466 U.S. at 688-89. Hence, counsel's assistance must fall "outside the wide range of professionally competent assistance" considering all the circumstances. *Id.* at 690. Further, choices of trial strategy are virtually unchallengeable because such a choice "is a matter of professional judgment to which a review of counsel's competency does not extend." *People v. Cundiff*, 322 Ill. App. 3d 426, 435 (2001); see *Strickland*, 466 U.S. at 690. "Trial strategy includes an attorney's choice of one theory of defense over another." *People v. Campbell*, 264 Ill. App. 3d 712, 732 (1992).

¶ 78                    2. *Counsel's Decision Not To Pursue Self-Defense Here*

¶ 79            Defendant contends trial counsel told him self-defense would be the trial strategy, but counsel changed it at the last minute against defendant's wishes and instead took the "all-or-nothing" approach of arguing the State failed to prove defendant was the shooter.

¶ 80                              a. Forfeiture

¶ 81            We first note the State contends defendant forfeited his claims because he could have raised the issue of ineffective assistance of counsel on direct appeal but did not do so. However, because defendant raised facts concerning ineffective assistance of counsel that do not appear in the original record—for example, he contends counsel told him the trial would proceed with a theory of self-defense, but counsel changed the theory at the last minute—we conclude that defendant did not forfeit these issues. See *People v. Williams*, 209 Ill. 2d 227, 233 (2004) (holding the doctrines of *res judicata* and forfeiture are relaxed where fundamental fairness requires, the forfeiture stems from the ineffective assistance of appellate counsel, or the facts relating to the issue do not appear on the face of the original appellate record).

¶ 82                              b. This Case

¶ 83    Here, counsel's choice to pursue an "all-or-nothing" defense was a matter of reasonable trial strategy. Before trial, counsel initially told the trial court during the hearing on the State's motion to continue to obtain gun residue test results that defendant would admit to having residue on his hands and argue self-defense. However, it was later revealed residue was not found on defendant's hands. Counsel then changed course and pursued an "all-or-nothing" defense. Defendant complains counsel's decision to change defenses was a poor decision because the lack of gunshot residue on his hands was easily explained. However, it is not enough that counsel chose a losing strategy. Instead, the strategy had to be unreasonable or based on a misapprehension of the law. See *People v. Walton*, 378 Ill. App. 3d 580, 589 (2007) (noting the decision of counsel to forgo a theory of self-defense and advance an "all-or-nothing" defense is a matter of valid trial strategy that is generally not unreasonable unless that strategy is based upon counsel's misapprehension of the law); see also *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 40 (holding whether to assert the affirmative defense of self-defense is itself a matter of trial strategy). Here, not only was there evidence defendant did not have gun residue on his hands, but the witnesses identifying him as the shooter had credibility issues. Meanwhile, in his postconviction petition and affidavit, defendant still did not admit to committing the crime. He admitted he fired shots at Nash, but he alleged Walls actually killed Nash. Thus, his additional facts do not support the view counsel's decision was unreasonable. Instead, counsel presented a valid defense, even though it was ultimately unsuccessful.

¶ 84    Further, defendant was subject to a minimum 25-year firearm enhancement for personally discharging a firearm causing the victim's death. Counsel could have reasonably wished to avoid bringing defenses into the trial that would admit to the shooting or bring the jury closer to finding defendant fired the shots that killed the victim because, if the defense failed, defendant

would be facing sentencing on both the murder conviction and the firearm enhancement.

¶ 85 Defendant argues counsel admitted to him after trial that counsel "knew that it was his fault why we lost at trial" and counsel would be willing to admit that in postconviction proceedings. He further averred counsel told him "how bad he felt about the way he handle[d] my defense or lack thereof." However, defendant does not state counsel admitted to any misapprehension of the law, and his vague claim regarding counsel's admission of fault is unsatisfactory to support such a conclusion. Accordingly, the record does not support a conclusion that counsel's decision to pursue an "all-or-nothing" defense was anything other than a valid trial strategy. Thus, defendant has not stated the gist of a constitutional claim.

¶ 86 3. *Counsel's Decision Not To Request a Second Degree Murder Instruction*

¶ 87 Defendant next argues counsel provided ineffective assistance because he failed to request a second degree murder instruction, against defendant's wishes.

¶ 88 a. The Applicable Law

¶ 89 A defendant can be found guilty of second degree murder only if the State first proves all the elements of first degree murder. *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 39; see 720 ILCS 5/9-2(a), (c) (West 2018). The defendant then has the burden of proving a mitigating factor by a preponderance of the evidence. *Neasom*, 2017 IL App (1st)143875, ¶ 39; see 720 ILCS 5/9-2(c) (West 2018). There are two possible mitigating factors: (1) an unreasonable belief that self-defense is justified or (2) the presence of an intense passion resulting from serious provocation by the victim. *Neasom*, 2017 IL App (1st) 143875, ¶ 40; see 720 ILCS 5/9-2(a)(1), (2) (West 2018). Defendant argues evidence existed that he had an unreasonable belief that self-defense was justified.

¶ 90 Although a defendant has the right to decide whether to offer a lesser-*included*

offense instruction, that rule is not applicable to second degree murder, which is a lesser-*mitigated* offense. *People v. Wilmington*, 2013 IL 112938, ¶ 48. As with the decision whether to pursue a theory of self-defense, whether to request and argue imperfect self-defense to support a second degree murder instruction is a matter of trial strategy. *People v. Acevedo*, 2024 IL App (2d) 230048-U, ¶ 45 (citing *Walton*, 378 Ill. App. 3d at 589).

¶ 91                                    b. This Case

¶ 92        Here, counsel's decision to not request a second degree murder instruction was (1) consistent with his overall trial strategy to pursue an "all-or-nothing" defense and (2) reasonable for the same reasons previously discussed regarding counsel's strategy to forgo arguing self-defense. Defense counsel was reasonable to pursue a defense strategy that would not require defendant's admission that he fired shots at Nash. Accordingly, defendant has not stated the gist of a constitutional claim of ineffective assistance of counsel.

¶ 93               B. Defendant's Proportionate Penalties Claim

¶ 94        Defendant, who was 18 at the time of the crime, next argues his 50-year sentence was a *de facto* life sentence that violated the proportionate penalties clause of the Illinois Constitution as applied to him because he was an emerging adult at the time of the crime and science has shown brain development continues into the early twenties.

¶ 95                     1. *The Proportionate Penalties Clause*

¶ 96        Defendant's as-applied constitutional challenge is rooted in a line of cases providing heightened protections for juvenile defendants in sentencing under the eighth amendment of the United States Constitution (U.S. Const., amend. VIII), which prohibits cruel and unusual punishment. See *Miller*, 567 U.S. at 479 (holding the eighth amendment prohibits sentences of mandatory life without parole for juvenile offenders convicted of homicide). The

Supreme Court reasoned in *Miller* that "children are constitutionally different from adults for purposes of sentencing" because they are less mature and more impulsive and vulnerable to peer pressure than adults. *Id.* at 471-74.

¶ 97 Under *Miller*, a juvenile defendant may be sentenced to mandatory life imprisonment without parole only after the trial court has considered factors that include, but are not limited to, the juvenile defendant's (1) chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) family and home environment; (3) degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) prospects for rehabilitation. *Id.* at 477-78.

¶ 98 The Illinois Supreme Court has expanded the *Miller* protections beyond the context of mandatory life sentences to include juvenile offenders who receive *de facto* life sentences. *People v. Reyes*, 2016 IL 119271, ¶ 9. The court has defined a *de facto* life sentence as a prison term of more than 40 years. *People v. Buffer*, 2019 IL 122327, ¶ 40.

¶ 99 Defendant acknowledges that he does not have a viable eighth amendment claim under *Miller* because he was 18 years old at the time of the offense. It is well established that offenders who are 18 years and older cannot raise a challenge to their sentences under the eighth amendment and the *Miller* line of cases. *People v. Harris*, 2018 IL 121932, ¶¶ 59-61. Instead, he presents his claim as a violation of the proportionate penalties clause of the Illinois Constitution.

¶ 100 The proportionate penalties clause states, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A statute violates the proportionate penalties clause if

either (1) the penalty is harsher than the penalty for a different offense containing identical elements or (2) the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community. *People v. Williams*, 2024 IL 127304, ¶ 24. Defendant challenges his 50-year aggregate sentence under the latter standard.

¶ 101     We review the gravity of the defendant's offense in connection with the severity of the statutorily mandated sentence within the community's evolving standards of decency. *Id.* We may determine whether a sentence shocks the moral sense of the community by considering both objective evidence and the community's changing standards of moral decency. *People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008).

¶ 102     "[A]n as-applied challenge is dependent on the particular facts and circumstances of the challenging party." *Williams*, 2024 IL 127304, ¶ 25. By presenting an as-applied challenge to a sentencing statute, the defendant "must ultimately overcome the presumption that the statute is constitutional by clearly establishing that the statute is invalid as applied to him." *Id.*

¶ 103     In cases involving direct appeals, the Illinois Supreme Court has recognized that young adults between 18 and 21 years old may rely on evolving neuroscience regarding brain development in juveniles and its correlation to maturity underpinning the *Miller* decision to support an as-applied challenge under the proportionate penalties clause of the Illinois Constitution. See *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (involving a 19-year-old defendant sentenced to a term of natural life in prison); *Harris*, 2018 IL 121932, ¶¶ 1, 48 (involving an 18-year-old defendant sentenced to 76 years in prison). In *Thompson* and *Harris*, the supreme court opened the door for young adult defendants to demonstrate that their own specific characteristics and circumstances were so like those of a juvenile that the imposition of a life sentence or *de facto* life sentence imposed without the considerations established in *Miller* would

violate the proportionate penalties clause. *Thompson*, 2015 IL 118151, ¶¶ 43-44; *Harris*, 2018 IL 121932, ¶ 48. More recently, the court has also considered a challenge by a young adult who was sentenced to less than a *de facto* life sentence, noting a defendant may challenge a sentence of any length. *People v. Hilliard*, 2023 IL 128186, ¶ 29.

¶ 104                                              2. *Forfeiture*

¶ 105          Initially, we note defendant did not raise his proportionate penalties claim on direct appeal. He also does not allege ineffective assistance of trial or appellate counsel regarding the issue. Thus, the State argues defendant forfeited the issue. However, the supreme court has instructed that such claims are best pursued through postconviction proceedings. See *Thompson*, 2015 IL 118151, ¶ 44; *Harris*, 2018 IL 121932, ¶ 48.

¶ 106          We recognize this case presents a circumstance different from typical cases addressing the matter for the first time in postconviction proceedings because defendant here actually raised the proportionate penalties issue at sentencing and presented evidence. However, counsel did not present all of the facts concerning defendant's background that he alleges in his postconviction petition and did not present studies regarding brain development in emerging adults. Because defendant's petition contains additional factual allegations that were not presented to the court, we find the matter was not forfeited.

¶ 107          Nonetheless, we conclude defendant is not entitled to an automatic advancement of his postconviction petition to the second stage because he still must state the gist of a claim that, taking his factual allegations as true, he was subjected to a sentence that shocks the moral sense of the community.

¶ 108          Defendant also asks that we read a claim of ineffective assistance of appellate counsel into his petition. We decline to do so. Although the doctrine of forfeiture does not bar

consideration of an issue where the forfeiture stems from the incompetency of counsel on appeal, a claim of ineffective assistance of appellate counsel must appear in the postconviction petition. *People v. Lacy*, 407 Ill. App. 3d 442, 461 (2011).

¶ 109                                3. *People v. Hilliard*

¶ 110        Defendant asserts his 50-year sentence violates the proportionate penalties clause based on his troubled childhood and lack of maturity. When asserting a violation of the proportionate penalties clause, "a defendant must show either that the penalty imposed is cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community; or that it differs from the penalty imposed for an offense containing the same elements." *People v. Klepper*, 234 Ill. 2d 337, 348 (2009). On this issue, we consider *Hilliard* particularly informative.

¶ 111        In *Hilliard*, the defendant, who was 18 when he shot and wounded a man, was sentenced to 15 years' imprisonment for attempted murder, with a 25-year mandatory firearm enhancement. *Hilliard*, 2023 IL 128186, ¶¶ 1, 6. On appeal, the defendant argued the 25-year enhancement was unconstitutional as applied to him under the proportionate penalties clause. *Id.* ¶ 1. The defendant's challenge was based on *Miller*, as well as *Harris*, *Thompson*, and *People v. House*, 2021 IL 125124, which discussed *Miller*'s application to the proportionate penalties clause. *Id.* ¶ 23. The supreme court distinguished the defendant's reliance on *Thompson*, *Harris*, and *House*, holding those cases considered the possibility of an 18-year-old or 19-year-old defendant's "raising a *Miller*-based challenge with respect to *mandatory* life sentences in *initial* postconviction petitions," as opposed to the defendant in *Hilliard*, who did not receive a mandatory or *de facto* life sentence. (Emphases in original and internal quotation marks omitted.) *Id.* ¶ 27. That impediment did not, however, foreclose a proportionate penalties clause challenge because a

defendant of any age may challenge a sentence of any length. *Id.* ¶ 29. Nevertheless, the court rejected the defendant's as-applied challenge to the mandatory firearm enhancement because the circumstances of that case had "no arguable basis in law" to conclude the sentence was unconstitutionally disproportionate as applied to him. *Id.* ¶ 40.

¶ 112 Notably, the court in *Hilliard* distinguished the facts of *Hilliard* from those in *People v. Miller*, 202 Ill. 2d 328, 330 (2002) (*Leon Miller*), a case in which a 15-year-old juvenile was sentenced to a 50-year term instead of mandatory life as required by statute and, after the State appealed, the supreme court affirmed the 50-year sentence. The court held that a mandatory sentence of natural life violated the proportionate penalties clause as applied to the 18-year-old juvenile defendant when he had moments to decide whether to help accomplices and stood as a lookout during a shooting in which the defendant never touched the gun. In *Leon Miller*, the defendant was automatically transferred for trial as an adult, tried under an accountability theory, and sentenced under a statue that did not allow for consideration of the defendant's age or participation in the crime. *Hilliard*, 2023 IL 128186, ¶¶ 33-34 (citing *Leon Miller*, 202 Ill. 2d. at 330-31).

¶ 113 The *Hillard* court noted *Leon Miller* was the only case in which the Illinois Supreme Court had held a mandatory minimum penalty unconstitutionally disproportionate as applied to a particular offender. *Id.* ¶ 33. The court determined *Leon Miller* was "readily distinguishable" from the case before it where the defendant acted alone, made a deliberate choice to approach the victim, and fired multiple shots without provocation. *Id.* ¶ 34. Moreover, the defendant was an adult who received a partially discretionary sentence, and his total sentence did not amount to a life sentence. *Id.* ¶¶ 34-35.

¶ 114 Ultimately, taking as true allegations about the defendant's troubled childhood, that

he had rehabilitative potential, and his brain was not yet fully developed at the age of 18, the supreme court concluded, when considered in conjunction with the circumstances of the crime, the defendant's sentence was "not even arguably cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." (Internal quotation marks omitted.) *Id.* ¶ 40. "Rather, [the] defendant's claim [was] frivolous and patently without merit because it [had] no arguable basis in law, such that the circuit court did not err in summarily dismissing the defendant's petition." *Id.*

¶ 115                                    4. *This Case*

¶ 116        Although the factual circumstances of *Hilliard* established a somewhat clearer and more egregious culpability than defendant's circumstances in this case and the defendant in *Hilliard* was sentenced to an aggregate of 40 years instead of 50, we nevertheless conclude that *Hilliard* is applicable here. Notably, *Hilliard* observed that *Leon Miller* was the only case in which the supreme court had held a mandatory minimum sentence unconstitutionally disproportionate as applied to a particular offender. And as we have noted, *Leon Miller* is distinguishable from the present case in many important respects.

¶ 117        Defendant here, as an adult, and under much more egregious circumstances than the 15-year-old defendant in *Leon Miller*, was also sentenced to an aggregate prison term of 50 years. Further, he was given the minimum sentences for murder and the firearm enhancement (45 years) after consideration by the trial court of his age and immaturity. And his aggregate sentence (45 years plus a consecutive sentence of 5 years for aggravated discharge of a firearm) was only one year over the minimum. As the supreme court noted in *Hilliard*, the legislative determination of a particular punishment for a crime is, in and of itself, an expression of the general moral sense of the people. The distinction between a juvenile and an adult is also significant. We particularly

note that, regarding the firearm enhancement, the legislature has afforded the trial court discretion to impose the enhancement on juveniles, but it deliberately did not extend that discretion to adults. See *id.* ¶ 36 (citing 730 ILCS 5/5-4.5-105 (West 2022)); *People v. Scott*, 2024 IL App (1st) 211173-U, ¶ 16. Also, although the circumstances of the crime in *Hilliard* were more egregious, we note that, as in *Hilliard*, defendant here filed multiple shots. Further, the record establishes defendant engaged in extensive gang activity and had a juvenile criminal history of weapons offenses.

¶ 118 Taking the facts alleged in defendant's petition concerning his troubled childhood and mental health struggles as true, and taking as true his allegations that his brain was not fully developed at the age of 18, coupled with the circumstances of the crime, we conclude the trial court's imposition of one year over the minimum aggregate sentence was not cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community and, as a result, it does not violate the proportionate penalties clause. See *Hilliard*, 2023 IL 128186, ¶ 40; see also *People v. Velasquez*, 2024 IL App (1st) 231046-U, ¶¶ 35-36 (holding a sentence five years over the minimum did not violate the proportionate penalties clause); *People v. Masters*, 2024 IL App (4th) 230370, ¶¶ 116-117 (applying *Hilliard* after third-stage postconviction proceedings and finding a *de facto* life term of 115 years for an 18-year-old offender did not violate the proportionate penalties clause). We note that our conclusion is particularly appropriate in any case when, as here, defendant received the minimum sentence for murder and the minimum mandatory firearm enhancement. See *Scott*, 2024 IL App (1st) 211173-U, ¶ 16.

¶ 119 Moreover, even if defendant's claim had an arguable basis in the law, a remand for resentencing would be futile because the trial court generally already took into consideration the relevant facts and circumstances at sentencing. The court specifically stated it took defendant's

age and immaturity into account when it imposed the minimum sentences for murder and the firearm enhancement. Defendant's troubled childhood was already well-reflected by the PSI, and the court specifically found that he lacked maturity. Contrary to defendant's assertions in his postconviction petition, he was already afforded a sentencing procedure that considered his age and immaturity. Accordingly, we hold that defendant's claim was frivolous and patently without merit because it has no arguable basis in law, such that the trial court did not err in summarily dismissing the defendant's petition.

¶ 120                          5. *De Facto Life Sentence*

¶ 121          Last, we note the State raises the issue of whether a *de facto* life sentence existed at all when, under fairly new legislation, a person under the age of 21 is able to seek parole after serving 20 years for first degree murder. Defendant here is eligible under that statute. See 730 ILCS 5/5-4.5-115(b) (West 2022).

¶ 122          In *People v Kendrick*, 2023 IL App (3d) 200127, ¶ 43, the Appellate Court, Third District, held there was no *de facto* life sentence when a defendant could seek parole after 20 years. *Kendrick* noted previous Illinois Supreme Court cases stating that, in assessing whether a *de facto* life sentence has been imposed, the court must consider the defendant's earliest opportunity for release. See *id.* ¶ 43 (citing cases). In *People v. Spencer*, 2023 IL App (1st) 200646-U, ¶ 143, *appeal docketed*, No. 130015 (filed Sept. 13, 2023), the Appellate Court, First District, adopted the view of *Kendrick*.

¶ 123          We note *Kendrick* and *Spencer* were decided before *Hilliard*, which held a defendant may challenge a non-*de facto* life sentence under the proportionate penalties clause. We also recognize *Spencer* is pending appeal in the supreme court. However, while not necessary to our determination that defendant's aggregate 50-year sentence did not violate the proportionate

penalties clause, and thus he did not state the gist of constitutional claim, we believe the applicability of section 4.5-115(b) supports our determination because, in addition to receiving an aggregate sentence of only one year over the minimum, defendant will also have the opportunity to seek parole after 20 years.

¶ 124                                    III. CONCLUSION

¶ 125          For the reasons stated, we affirm the trial court's judgment.

¶ 126          Affirmed.